**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**
**CIVIL ACTION NO.  3:18-CV-00631-CHL**

**ERIC GILL,**                                                                                    **Plaintiff,**

**v.**

**JAMES COYNE , et al.,**                                                           **Defendants.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Eric Gill ("Gill") alleges that he was subjected to various infringements on his civil rights and seeks relief under 42 U.S.C. § 1983 for violations of the First and Eighth Amendments to the United States Constitution and under 42 U.S.C. § 2000cc-2 for violations of his statutory free exercise rights.  (DN 1, at PageID # 3–12.)  Gill brings these claims against Defendants James Coyne ("Coyne"), individually and in his official capacity as a deputy warden at the Luther Luckett Correctional Complex ("LLCC"), Jessie Ferguson ("Ferguson"), individually and in her official capacity as a deputy warden at LLCC, Lindsay Blevins ("Blevins"), individually and in her official capacity as a unit administrator at LLCC, Misty Hair ("Hair"), individually and in her official capacity as a unit administrator at LLCC, Betty Ramos ("Ramos"), individually, and Brian Owens ("Owens"), in his individual capacity (collectively "Defendants").  (*Id.*, at PageID # 2–3.)  The Parties have consented to the jurisdiction of a Magistrate Judge to enter judgment in this case with direct review by the Sixth Circuit Court of Appeals in the event an appeal is filed. (DN 29.)  Defendants have moved for summary judgment on all claims.  (DN 46.)  Gill filed a response in opposition.  (DN 51.)  This matter is now ripe for review.

## I.      BACKGROUND

Gill's claims stem from his alleged treatment while incarcerated at LLCC in July 2018. Since 2001, Gill has been serving a life sentence for charges unrelated to this action and has been held at several facilities operated by the Kentucky Department of Corrections ("KDOC") during that time.  (DN 46-2, at PageID # 181; DN 46-6, at PageID # 275.)  On June 19, 2018, Gill was transferred from the Kentucky State Reformatory ("KSR") to LLCC.  (DN 51-6, at PageID # 431.) On August 10, 2018, Gill was transferred from LLCC to Little Sandy Correctional Complex.  (DN 46-2, at PageID # 198.)  Gill's claims arise from three separate incidences that took place during his stay at LLCC.

### a.  Incident with Gill's Cellmate

Gill was placed in the restrictive housing unit, and on July 7, 2018, another inmate, C.M., was placed in his cell.  Gill alleges that he was sexually assaulted by C.M. and detailed the incident at the time in an inmate grievance form.  (DN 46-4, at PageID # 229–31.)  What follows is a summary of Gill's grievance.  C.M. was acting erratically upon entering the cell on July 7, 2019 and made sexually explicit comments and gestures toward correctional staff throughout the day. (*Id.*, at PageID # 230.)  The following day, C.M. asked an inmate "watcher" to retrieve Parole Officer Excelle ("Excelle"), one of several parole officers that were recruited to cover shifts at the time when LLCC was short-staffed.  (*Id.*, at PageID # 230.) (*See* DN 46-6, at PageID # 298.)  C.M. threatened to beat his head against the window until she came and "started beating his head on the window . . . ."  (*Id.*, at PageID # 230.)  When Excellee arrived, C.M, told her that "he was gonna get naked and get in his bunkies bed with him."  (*Id.*)  Officer Excellee gave C.M. an extra tray of food in exchange for his agreement not to do so.  (*Id.*)  Soon after, C.M. removed his clothes, "stood on the bed rail and shook his penis and was yelling sexual comments and he was becoming

more and more incoherent." (*Id.*)  Gill asked to speak to a member of corrections staff that he identifies as "Lt. Adams" ("Adams") and was eventually brought to Lt. Adams's office. (*Id.*)  Gill explained C.M.'s behavior and requested to be placed in another cell. (*Id.*)  Adams told Gill that no one was honoring his trades and returned Gill to his cell with C.M. (*Id.*)  Later that day, Gill went to sleep and awoke, noting, "I felt something penetrate my rectum so a looked and [C.M.] is in my bed trying to push his finger in my butt." (*Id.*)  A struggled ensued and Gill pushed C.M. to the floor. (*Id.*)  Gill beat the cell window to get the attention of correctional staff. (*Id.*)  Owens arrived and Gill asked to speak with him "about an urgent PREA matter," but when Gill declined to discuss it through his cell door, Owens "just walked away." (*Id.*)  About twenty minutes later, Gill told another corrections officer what had happened, and was subsequently moved to another cell. (*Id.*)

On July 9, 2018, the day after the assault, Paige McGuire, who is listed on an incident report as a staff nurse, sent an email to PREA coordinator Helen Long notifying her that Gill reported a sexual assault. (DN 46-7, at PageID # 321.)  The same day, an investigation was initiated by the PREA coordinator, who interviewed Gill and C.M. and reviewed the security footage of the incident. (DN 46-3, at PageID # 224–27.)  The investigation concluded with a finding that Gill's allegations were unsubstantiated because the security camera's view of Gill's bed was obstructed. (*Id.*, at PageID # 226.)  It is unclear whether Gill reported the assault to McGuire directly or if she was made aware of the report from another source. The only entries on Gill's medical history record for July 9, 2018 are a medication renewal and mental health watch review. (DN 51-2, at PageID # 407.) On July 19, 2018, Gill completed a healthcare request stating: "I filled out a sick call for some ointment because I have some type of scratch in my rectum & I never heard anything." (*Id.*, at PageID # 408.)  In response to this request, a nurse prescribed a

topical ointment on July 20, 2018.  (*Id.*)  It does not appear that Gill was examined in connection

with this prescription.  (*See id.*)  Gill testified that he was never sent for medical examination in

connection with the assault despite requesting that Coyne, Ferguson, Blevins, Owens and Hair do

so.  (DN 46-2, at PageID # 205–08, 210–213, 215.)

### b.  Exposure to Cold Temperature

On July 15, 2018, a corrections officer observed Gill, with the assistance of his cellmate,

lift himself up the wall of his cell and scratch the screen of a security camera with an unknown

object.  (DN 51-2, at PageID # 412.)  A cell entry team was subsequently called to remove both

inmates and place them each in a restraint chair.  (*Id.*)  A restraint chair allows correctional staff

to bind inmates at the ankles, wrists, shoulders, and waist.  (DN 46-6, at PageID # 305.)  LLCC is

equipped with several restraint chairs, and they are used "quite often."  (DN 46-6, at PageID #

305; DN 46-5, at PageID # 256.)  In the restrictive housing unit, the restraint chairs are placed in

the showers.  (DN 46-6, at PageID # 306.)  Coyne testified that this location was selected because

there was limited space in the facility where "the restraint chair could be restrained to the wall so

inmate couldn't knock it--or tip it over."  (*Id.*)  During his deposition, Gill explained that "[t]hey

got the space where the shower runs, and they got a space on over where you can step out of and

dry off at.  It's got two vents right there. I believe it's two vents. I know one for sure."  (DN 46-2,

at PageID # 196.)  Gill testified that he was secured in the restraint chair, and "they pushed me in

that room in the shower . . . right in front of the vent that's blowing down on me."  (*Id.*)  At the

time, he was naked, but for a pair of paper boxers.  (*Id.*, at PageID # 195–96.)  Gill testified: "I

froze to death in that chair. I mean really froze to death. Hands started aching real bad, feet

shivering."  (*Id.*, at PageID # 184.)  In a grievance dated July 19, 2018, Gill wrote that after thirty

or forty-five minutes, "I sent for the nurse because I was feeling funny, freezing & couldn't quit

4

shivering." (DN 51-2, at PageID # 410.) He testified: "I asked them to move me and they didn't. And I got the nurse up there and the nurse even told them my hands is [sic] turning blue and they still wouldn't move me." (DN 46-2, at PageID # 197.) Gill wrote in his grievance: "[w]hen they finally came to take me out the chair, I could barely talk & I couldn't stop shaking. The chill bumps on me were so big it looked like I had a bad rash." (DN 51-2, at PageID # 411.)

After he was removed from the restraint chair, according to Gill, "[t]hey put me in a cell downstairs . . . I was freezing in the cell. Tried to cover the vent up, I couldn't get the vent covered. I told them we need sheets or something. They still wouldn't give me some sheets and I was just up there in that shower freezing to death." (DN 46-2, at PageID # 198.) Gill wrote in his July 19, 2018 grievance that he still wore only paper boxers and "froze all night & couldn't sleep cause the steel bunk was way too cold & hard to lay on . . . it went on for at least 18 hours." (DN 51-2, at PageID # 411.) When asked about any injury he suffered as a result of his exposure, Gill testified "I didn't have frostbite, but the only pain is stinging in my hands and feet and just freezing. I mean it's a painful situation when there's nothing there--you go from one freezing area to another one." (DN 46-2, at PageID # 200.)

### c. Kosher Meals

Gill is Jewish and follows a kosher diet as a part of his religious practice. (DN 46-2, at PageID # 193, 208.) LLCC does not have a kosher kitchen; kosher meals served to inmates are prepared at KSR, transported to LLCC, and delivered individually to inmates enrolled in the kosher diet program. (DN 46-6, at PageID # 280–81.) To enroll in the program, "inmates had to sign up for it through the chapel" and enter into a kosher diet participation agreement. (DN 46-8, at PageID # 335–336, 338.) These agreements conditioned enrollment in the program on the inmate's adherence, and witness testimony indicates that declining a kosher meal or eating a non-kosher

5

was grounds for removal from the program.  (DN 46-2, at PageID # 189–91; DN 46-6, at PageID # 292–93; 335–36.)  When Gill transferred to LLCC from KSR, he was enrolled in the kosher diet program pursuant to his March 28, 2017 participation agreement.  (DN 46-6, at PageID # 284–85.)  In a grievance dated July 1, 2018, Gill reported ongoing issues with his meals.  (DN 51-6, at PageID # 431–42.)  Gill wrote that each day since his arrival, his kosher meals arrived "hours late, ice cold & mixed and scrambled all together."  (*Id.*, at PageID # 431.)  Gill also wrote that on two occasions, no kosher meal was ever delivered.  (*Id.*, at PageID # 432.)  Coyne testified that, in response to Gill's initial complaint, he contacted the deputy warden of KSR about the issues with the kosher trays and was told that KSR personnel delivered the trays intact and on time and that the issues were on LLCC's end.  (DN 46-6, at PageID # 287–88.)  Coyne testified that he then met with LLCC security staff "and informed them that it was a priority to get those meals to Gill as soon as possible . . . ."  (*Id.*, at PageID # 288.)  Coyne says that he subsequently followed up with Gill as well as KRS about the issue.  (*Id.*)

On July 14, 2021, there was a dispute between Gill and Ramos, who was then tasked with delivering meals in restricted housing.  In a grievance dated July 17, 2018, Gill reported, "[w]hen my kosher arrived from K.S.R. with my name on it, she refused to give to, stating 'I put two trays in there.'"  (DN 51-6, at PageID # 631.)  During her deposition, Ramos confirmed this testifying, "Kosher trays hadn't arrived yet. And when I passed out trays, I was not advised by Mr. Gill that he was kosher; instead, he waited, and then he told me he was kosher."  (DN 46-8, at PageID # 336.)  Ramos explained, "I requested that . . . he return the tray I had given him that wasn't kosher uneaten; and he could not, so I did not give him his kosher meal."  (*Id.*, at PageID # 336.)  During his deposition, Gill testified, "[m]y cellie took the two trays . . . I don't have nothing to do with that."  (DN 46-2, at PageID # 190.)  Ramos believed that Gill had eaten one of the non-kosher

trays because "he had received multiple disciplinary reports for eating food that wasn't kosher in the kosher program in the past, and [she] was not going to take the risk of giving him extra food because of his history." (DN 46-8, at PageID # 337.)

In a grievance dated July 17, 2018, Gill reported the incident and wrote that as a result of Ramos denying him his kosher tray, he "never ate & was starving until dinner." (DN 51-6, at PageID # 436.) After Gill filed this grievance, Ramos wrote him up for a disciplinary violation. (DN 51-6, at PageID # 439.) In an incident report dated July 23, 2018, Ramos wrote, "Gill [] took a regular tray from me . . . After chow was complete [] Gill demanded a KOSHER tray . . . I advised [] Gill I would not give him a KOSHER tray since he had already eaten the regular tray. [] Gill at this point became belligerent and disrespectful toward myself." (DN 51-6, at PageID # 439.) The report has a backdating endnote stating that "the correct date and time is the time listed in the body of the report of 7/14/18." (*Id.*) Sergeant Joseph Sibrel ("Sibrel") was assigned to investigate Ramos's report. (*Id.*) Based on his investigation, Gill was charged with "[o]btaing money/goods/privileges/services w/false pretenses." (*Id.*, at PageID # 440.) A hearing on the matter resulted in a finding that the charge was supported by Ramos's report that she did not give Gill a kosher tray because he had already eaten a non-kosher tray and by Sibrel's finding that Gill's cellmate took both trays from Ramos without stating that Gill was in the kosher diet program. (*Id.*, at PageID # 441.) As a result, Gill was removed from the kosher diet program. (DN 46-6, at PageID # 293.) The disciplinary action also resulted in Gill's July 17, 2018 grievance being rejected. (DN 51-6, at PageID # 434.)

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In deciding a motion for summary judgment, the district court views the factual evidence and draws all reasonable inferences in favor of the non-moving party. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 592 (6th Cir. 2001).  To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact.  *See Klepper v. First Am. Bank*, 916 F.2d 337, 341–42 (6th Cir.1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).  A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 342 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## III.    DISCUSSION

Below, the Court addresses whether Defendants are entitled to summary judgment on each of Gill's claims.

### a.    Counts I, II, and V – Gill's Eighth Amendment Claims

To show a constitutional violation under the Eighth Amendment, an inmate must show that a defendant was deliberately indifferent to his or her safety.  *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011).  Deliberate indifference has two prongs, an objective prong and a subjective one. *Id.*

#### i.    Failure to Protect

In Count I of his complaint, Gill alleges that Coyne, Ferguson, Blevins, Hair, and Owens failed to protect Gill from a physical attack.  (DN 1, at PageID # 8–9.)  Specifically, Gill alleges that these "Defendants were aware of an [sic] substantial risk of serious harm to Mr. Gill from

8

being placed with a mentally unstable cellmate" and that they "ignored that risk, however, and allowed Mr. Gill to be sexually assaulted by the cellmate." (*Id.*, at PageID # 9.)

## 1. Objective Prong

The objective prong for an Eighth Amendment claim requires a plaintiff to show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Bishop*, 636 F.3d at 766 (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). "In considering the types of conditions that constitute a substantial risk of serious harm, the Court considers not only the seriousness of the potential harm and the likelihood that the harm will actually occur, but evidence that unwilling exposure to that risk violates contemporary standards of decency." *Cunningham v. Ward*, No. 07-2648-B/P, 2007 WL 4209093, at *3 (W.D. Tenn. Nov. 27, 2007) (citing *Helling v. McKinney*, 509 U.S. 25, 36 (1993)). In most cases, "the Sixth Circuit examines whether there was an objectively substantial risk of harm to the inmate before the injury occurred." *Holder v. Saunders*, No. CIV. 13-38-ART, 2014 WL 7177957, at *5 (E.D. Ky. Dec. 16, 2014) (citing *Bishop*, 636 F.3d at 766). Additionally, at least one panel of the Sixth Circuit has evaluated the objective component of the Eighth Amendment analysis retrospectively. *See Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001). In that case, the very fact that the inmates experienced the harm complained of was enough for the panel to find the inmates were "incarcerated under conditions posing a substantial risk of serious harm." *Id.* (finding "the harm alleged by all plaintiffs . . . is sufficiently serious to fulfill the objective component of this definition"). In other words, the court did not look to the risk of harm to which officials allegedly exposed plaintiffs, but rather to the seriousness of the actual harm plaintiffs suffered. Here, Defendants' motion does not appear to argue that the objective prong is not met.

The Court finds that the objective prong is met under both of the Sixth Circuit's standards. As to the risk of harm before the assault, viewing the facts most favorably to Gill, C.M. posed a substantial risk of serious harm to Gill. At the time of the assault, Gill was 5'7 and weighed 160 pounds, while C.M. was 5'11 and weighed 220 pounds. (DN 46-3, at PageID # 224–25.) Thus, if C.M. wanted to attack Gill, he was certainly at a physical advantage. Gill has offered evidence that C.M. displayed erratic behavior immediately upon being placed in his room. (*See* DN 46-4, at PageID # 230.) Gill testified that C.M. was "[n]aked -- they put him in there naked. And he's already talking delusional, to me it is delusional because it's not making sense . . . So he had more serious problems than me. And he's talking to the floor and rolling under the bed." (DN 46-2, at PageID # 201.) Gill testified that at the time he "[t]ried to talk to [C.M.] a couple of times just to see if [he] could calm [C.M.] some but didn't work." (*Id.*) Gill reported that C.M. told an officer "that he was going crazy and not responsible for his actions." (DN 46-4, at PageID # 230.) Later that night, C.M. told an officer "that he was gonna get naked and run around the cell and he told [the officer] to get him a phone so he can stick it in his butt and make it vibrate." (*Id.*) The following day, C.M. demanded that a unit watcher retrieve Officer Excellee and threatened to "bang his head on the windows until she comes talk to him." (DN 46-4, at PageID # 230.) C.M. then "start[ed] beating his head on the window." (DN 46-2, at PageID # 201.) When Officer Excellee arrived, C.M. told her he planned on sexually assaulting Gill, specifically that "he was gonna get naked and get in his bunkies bed with him." (*Id.*) Officer Excellee gave C.M. an extra tray of food in exchange for his agreement not to do so. (*Id.*) Soon after, C.M. removed his clothes, "stood on the bed rail and shook his penis and was yelling sexual comments and he was becoming more and more incoherent." (*Id.*) Gill also reported that C.M. "would make sexual comments to every inmate and staff member that walked by." (DN 46-3, at PageID # 224.) Due

to his concerns about C.M.'s behavior, Gill repeatedly asked Adams to move him to a different cell.  (DN 46-2, at PageID # 202.)

Based on these allegations that Gill was forced to room with a mentally unstable person showing sexual aggression who had threatened to commit unwanted sexual acts toward Gill, a reasonable jury could find an objectively substantial risk of harm.  *Williams v. Wells*, No. 02-74530, 2006 WL 800788, at *7 (E.D. Mich. Mar. 29, 2006) ("A threat of bodily harm is sufficiently serious to satisfy the objective component of a deliberate indifference claim.") (citing *Curry*, 249 F.3d at 506).  *Cf. Holder v. Saunders*, No. CV 7:13-38-KKC, 2019 WL 4927097, at *8 (E.D. Ky. Oct. 7, 2019) (finding objective prong was not met when plaintiff was attacked by his schizophrenic cellmate who had a history of violence because the cellmate had not specifically threatened the plaintiff, there were no reports that the cellmate was acting strangely, and he "was interacting just fine with the other inmates, including [the plaintiff], prior to the attack").

As to the harm that actually occurred, Gill has presented evidence that C.M. got into bed with him, pierced his finger through Gill's paper underwear and inserted it into his anus, scratching his rectum in the process.  (DN 1, at PageID # 6; DN 46-2, at PageID # 201–03; DN 46-4, at PageID # 230.)  In other words, Gill has presented evidence that he was digitally sodomized while in KDOC custody.  "Rape, coerced sodomy, unsolicited [sexual] touching . . . are 'simply not part of the penalty that criminal offenders pay for their offenses against society.'"  *Women Prisoners v. District of Columbia*, 877 F. Supp. 634, 665 (D.C. Cir. 1994) (quoting *Farmer*, 511 U.S. at 834), *vacated in part on other grounds*, 9 F.3d 910, 320 U.S. App. D.C. 247 (D.C. Cir. 1996).  This outcome coupled with the specific threats C.M. directed at Gill is sufficient for a reasonable juror to conclude that Gill faced a substantial threat of serious harm.  *See Richardson v. Bauman*, 702

F. App'x 402, 404 (6th Cir. 2017) (finding the objective prong met when the plaintiff requested protection from threatened attacks by gang members and was subsequently stabbed).

## 2. Subjective Prong

The subjective prong requires showing that the individual defendants (1) were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]; (2) actually drew the inference; and (3) consciously disregarded the risk." *Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017) (internal quotation marks omitted). The subjective prong is not limited to knowledge of a specific threat that an inmate is facing; prison officials can be found deliberately indifferent if they are aware that an inmate belongs to a class of persons who are vulnerable to assault and fail to protect him or her. *Bishop*, 636 F.3d at 767 (citing *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004)). Additionally, subjective knowledge can be imputed to a prison official based on a finding that he "must have known" because he "was exposed to information regarding a substantial risk that was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past.'" *Reedy v. West*, 988 F.3d 907, 916 (6th Cir. 2021) (quoting *Farmer*, 511 U.S. at 842–43.) However, a prison official who is unaware of a substantial risk of harm may not be held liable even if the risk was obvious and a reasonable prison official would have noticed it. *Bishop*, 636 F.3d at 767.

This standard is higher than mere negligence, and most akin to criminal recklessness. *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). In cases with multiple defendants, courts must evaluate the subjective prong for each defendant individually. *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005). A plaintiff may show a prison official had this awareness of this risk in "the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842.

Defendants argue that Gill's complaint does not allege that any of the Defendants other than Owens were aware of his cellmate's instability or threats toward Gill in advance of the assault. (DN 56, at PageID # 165–66.)  Defendants note that the individuals that Gill alleges to have told about his cellmate's threats are not among the named Defendants, and that the evidence in the record indicates that Owens and Coyne were alerted to the threat only after the assault took place. (*Id.*)  In response, Gill argues that Officer Excelle had a duty to separate Gill from his cellmate when she became aware of the threat the cellmate posed to Gill, but that her absence from this lawsuit does not preclude liability.  (DN 51, at PageID # 374.)   Gill asserts that Coyne, as the Deputy Warden of Security tasked to oversee the housing unit, "would have been aware of an inmate in severe mental distress acting erratically and engaging in inappropriate sexual behavior while making threats of a sexual attack on his cellmate."  (*Id.*)   Gill says that his cellmate's behavior was "visible to correctional staff and, after Mr. Gill spoke to correctional officers, would have come to Defendant Coyne's attention because of the security threat they posed."  (*Id.*, at PageID # 374–75.)

Here, there is no direct evidence that the Defendants subjectively perceived any risk posed to Gill in housing him with C.M.  It is undisputed that the Defendants did not directly observe the erratic behavior or sexual comments by Gill's cellmate prior to the assault.  (*See* DN 46-1, at PageID # 165–66; DN 51, at PageID # 374.)  Additionally, the only person Gill spoke to about the C.M.'s behavior prior to the assault was Adams.  Gill has not offered any evidence that any of the Defendants were made aware of C.M.'s behavior or Gill's conversation with Adams prior to the assault.  Instead, Gill hopes that the Court will infer that at least one Defendant, Coyne, was aware of the threat C.M. posed to Gill based on the nature of the threat and the scope of Coyne's job duties.  (DN 51, at PageID # 374–75.)

The Sixth Circuit has previously imputed subjective knowledge of a substantial risk based on such circumstantial evidence. *Bishop*, 636 F.3d at 772. In *Bishop*, the plaintiff had been repeatedly sexually assaulted by his cellmate before reporting the abuse to corrections staff. *Id.* at 762. The Court found that one of the defendants, a deputy who was working as a "D-Block runner" at the time of the assaults, was subjectively aware of the risk posed to the plaintiff in being housed with his cellmate because the defendant "testified that guards spend sixty percent of their shifts in D–Block in close proximity to the inmates, and guards assigned to the Mental Health Step–Down Unit can hear everything the inmates say." *Id.* at 772. The defendant had also "acknowledged that if [plaintiff's cellmate] had been aggressing on other inmates as alleged by [plaintiff], then he would have been aware of the situation. He had no explanation for why he did not hear the aggression other than speculation that it might not have occurred." *Id.*

Here, there is not similarly persuasive circumstantial evidence that suggests that the Coyne was aware of the risks posed to Gill prior to the assault. No evidence has been presented that Coyne was even working in the restrictive housing unit during the times when C.M. was acting erratically. Similarly, Gill has not presented evidence that anyone told about C.M.'s behavior prior to the assault. In fact, when asked whether Coyne had any involvement in the assault claim, Gill testified: "To my knowledge, no. I don't know who told Adams he couldn't move me, but to my knowledge no. I don't know. I have no idea with that." (DN 46-2, at PageID # 204.) For his part, when asked whether he spoke to Adams about the assault, Coyne testified: "I don't even know who Lieutenant Adams is." (DN 46-6, at PageID # 298.) While Gill asserts that Coyne, as the individual charged with security for the unit, would have been made aware of the security threat C.M. posed, the record does not support this assumption. For example, the evidence does not suggest that Coyne was alerted to every incident of erratic or aggressive behavior by an inmate or

14

notified of every request by an inmate to be separated from another inmate.  *See, e.g.*, *Thorp v. Ohio Dep't of Rehab. & Correction*, No. 2:15-CV-1121, 2017 WL 661492, at *6 (S.D. Ohio Feb. 17, 2017) (defendant admitted to receiving reports of every assault, received daily reports of each shifts activities, and had knowledge that a prior incident took place involving the plaintiff).  Indeed, Coyne testified that conversations like the one between Gill and Adams "happen[] on a regular basis" with "no documentation."  (DN 46-6, at PageID # 297.)  Additionally, this is not a situation like in *Bishop*, where the noise generated by an inmate's aggressive behavior would have necessarily been obvious to the defendant because of the layout of the facility and the defendant's consistent proximity to the inmates.  Here, the restrictive housing unit is far larger than the unit in *Bishop*, and Coyne testified that while he does do rounds, his job is mostly administrative.  (DN 46-6, at PageID # 279.)  Notwithstanding Coyne's role overseeing security in the unit, the question is not whether Coyne should have been aware of the threat C.M. posed to Gill.  And while actual knowledge may be proven through circumstantial evidence, "[r]ank speculation will not avoid summary judgment."  *Powell v. Fugate*, 364 F. Supp. 3d 709, 729 (E.D. Ky. 2019).  Based on the evidence presented, no reasonable jury could find that any of the Defendants had the necessary subjective culpability to establish a *prima facia* Eight Amendment violation.

### ii.  Failure to Provide Medical Care

In Count II of his complaint, Gill alleges that Defendants Coyne, Ferguson, Blevins, Hair, and Owens denied Gill proper medical care.  (DN 1, at PageID # 9.)  Specifically, Gill alleges that he told each of these Defendants that he was sexually assaulted and had not received a medical examination and that they "denied and/or delayed proper medical care in deliberate indifference to the risk of harm to Mr. Gill."  (*Id.*, at PageID # 7, 9.)

Under the objective prong, a pretrial detainee must show an objectively "sufficiently serious" medical need. *Farmer*, 511 U.S. at 834. To show that the medical need was sufficiently serious, the plaintiff must show that the conditions of incarceration imposed a "substantial risk of serious harm." *See Miller v. Calhoun County*, 408 F. 3d 803, 812 (6th Cir. 2005) (internal citations omitted). The Sixth Circuit recognizes two theories under which a plaintiff can demonstrate the objective component of an Eighth Amendment deliberate indifference claim. First, if a plaintiff suffered from a minor or non-obvious medical condition, he can show that his condition was objectively serious "if it is 'one that has been diagnosed by a physician as mandating treatment.'" *Id.* at 897 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). Second, "where a plaintiff's claims arise from an injury or illness 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,'" the plaintiff can meet the objective prong by showing "that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id.* at 899–900 (quoting *Gaudreault*, 923 F.2d at 208).

Here, Gill argues that his need for medical services to treat "a scratch on his rectum" after the assault was obvious. (DN 51, at PageID # 378.) Even accepting Gill's own allegations of injury as true, he has failed to create a genuine issue of material fact regarding the severity of his injury. Given that Gill's alleged injury was internal, it was not plainly visible. Even if direct observation were possible, the most that could be seen would be a scratch. Gill testified that he didn't know "what kind of [abrasions] or not was [sic] down there" and that he "think[s] [C.M.'s] nails scraped me or something." (DN 46-2, at PageID # 205.) When asked whether his injury resulted in bleeding, Gill testified: "I didn't even look . . . I don't remember -- there was such anger . . . I can't tell you if there was or there wasn't." (*Id.*) This testimony is consistent with Gill's July

19, 2018 healthcare request for ointment for "some type of scratch [his] my rectum."  (DN 51-2, at PageID # 408.)  Based on this evidence, no reasonable jury could find that Gill sustained the kind of injury that requires immediate medical attention.  *See Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004) (citing cases involving nonobvious and minor injuries that did not support Eighth Amendment claims, including minor cuts and bruises resulting from a glass splinter that required neither stitches nor painkillers and a knee injury for which it was "merely preferable" that the prisoner receive treatment).  *See also Nickens v. Anderson*, 56 F. App'x 244, 245 (6th Cir. 2003) (finding that the plaintiff suffered only a "minor injury" when "a tip of a lead pencil became lodged in his hand"; *Lockett v. Suardini*, 526 F.3d 866, 877 (6th Cir. 2008) ("allegations of minor cuts and lacerations do not support [the] claim that [] injuries were, objectively speaking, sufficiently serious to necessitate medical treatment").

The Court finds that Gill has failed to establish that his injury was so obvious that a layperson would have recognized his need for medical attention.  Because Gill only suffered a minor or nonobvious injury, for his Eighth Amendment claim to survive, "medical proof is necessary to assess whether the delay caused a serious medical injury."  *Blackmore*, 390 F.3d at 898 (6th Cir. 2004) (citing *Napier,* 238 F.3d at 742).  Here, no such medical proof has been offered.  In fact, Gill "does not allege that he suffered any long term effect from the injury or the delay in treatment. Therefore, [Gill] fails to state a claim under the Eighth Amendment."  *Nickens*, 56 F. App'x at 245.

### iii.  Unreasonable Exposure to Cold Temperatures

In Count V of his complaint, Gill alleges that Defendants Coyne, Ferguson Blevins, and Hair subjected him to unreasonable conditions of confinement.  (DN 1, at PageID # 11.)

Specifically, Gill alleges that these Defendants "intentionally placed Mr. Gill in the direct path of unreasonably cold air without providing means to maintain a basic level of warmth." (*Id.*)

Excessively low cell temperatures may state an Eighth Amendment claim under certain circumstances. *See Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (noting that "a low cell temperature at night combined with a failure to issue blankets" may establish an Eighth Amendment violation); *Spencer v. Bouchard*, 449 F.3 d 721, 728 (6th Cir.2006) (pretrial detainee's confinement to cold cell continuously for several months, coupled with leaking ceiling in cell, constituted sufficiently serious deprivation to support detainee's inadequate-shelter claim against county officials). The circumstances, nature, and duration of the alleged deprivation "must be considered in determining whether a constitutional violation has occurred." *Spencer*, 449 F.3d at 728 (citing *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir.2000))

Defendants deny that Gill was exposed to unreasonable cold temperatures. (DN 46-1, at PageID # 449.) They rely on Coyne's testimony that space constraints required that restraint chairs be used in specific locations which are "monitored by maintenance staff to maintain appropriate temperatures." (*Id.*) Defendants also suggest that any exposure Gill endured was not their decision because "it was medical staff's responsibility to monitor an inmate's medical condition every two hours while in the restraint chair . . . [and] [i]nmate's behavior also dictated how long they remained in a restraint chair . . . ." (*Id.*) In response, Gill argues that "the totality of the conditions"—over two hours restrained naked under a cold air vent, "followed by a full night in a freezing cell," all while being denied sheets or blankets—amounted to an unconstitutional deprivation. (DN 51, at PageID # 382.)

Gill proffers that *Spencer* is instructive. (DN 51, at PageID # 382.) In *Spencer*, the plaintiff alleged that he was kept in a cold cell without appropriate clothing for more than ninety days. He

presented evidence indicating that corrections officers wore winter coats in this cell block, that rain and snow leaked into his cell. *Spencer*, 449 F.3d at 728. The court found that while there was uncertainty as to exactly how cold it was in the cells, it was clear that the plaintiff endured it for several months, including in December and January. *Id.* at 728–29. The court emphasized that the long period of the deprivation was an important factor in raising it to a constitutionally cognizable level. *Id.* Gill admits that, unlike the plaintiff's situation in *Spencer*, his "cold exposure, thankfully, did not persist for months, but his exposure was total." (DN 51, at PageID # 382.)

Even viewing the facts most favorably to Gill, the Court finds that as a matter of law, Gill's exposure to cold did not constitute "conditions intolerable for prison confinement." *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981). Gill has presented evidence that he was strapped into a restraint chair wearing nothing but paper boxers for "no less than two hours," placed in a shower "7 or 8 feet" below a vent blowing cold air. Additionally, Gill has presented evidence that he was subsequently placed in a cell without any means of staying warm for eighteen hours. This experience is distinguishable from the facts presented in *Spencer* in several ways, "the most important being the length of time" that he was exposed to cold. *Harris v. Hulkoff*, No. 2:05-CV-198, 2007 WL 2479467, at *4 (W.D. Mich. Aug. 28, 2007). At most, Gill was exposed to cold for twenty-four hours. He was not exposed to rain or snow, and in fact, the exposure took place in July, the state's hottest month in terms of average daily temperatures. And although Coyne testified that "there was [sic] cells that were towards the end of the wing that got colder than other cells" and he "got complaints about temperature in those wings all the time," there is no evidence that temperatures were uninhabitably cold between July 15 and 16, 2018. (DN 46-6, at PageID # 313.) In fact, Coyne testified that he regularly instructed maintenance personnel to check the

temperatures, and "never once was he told that the temperature was out of the range of what it was supposed to be." (*Id.*, at PageID # 311.)  Additionally, unlike in *Spencer*, there is no evidence that other inmates complained about the temperatures in the areas Gill was placed or that corrections staff wore additional warm clothing while working in the areas.  In sum, "[t]he plaintiff in *Spencer* presented an entirely different level of deprivation from that alleged here." *Harris v. Hulkoff*, No. 2:05-CV-198, 2007 WL 2479467, at *4 (W.D. Mich. Aug. 28, 2007) (finding no Eighth Amendment violation when the plaintiff was denied a blanket while on suicide watch for no more than fifty-two hours during the month of June).

Gill attempts to elevate his alleged deprivation beyond a line of cases involving exposure to cold that have been distinguished from *Spencer*.  (DN 51, at PageID # 383) (citing *Walker v. Weidner*, No. 1:18CV640, 2018 WL 4335640, at *4 (N.D. Ohio Sept. 11, 2018)).  *See Ellis v. Mohr*, No. 1:13 CV 1058, 2017 WL 4155769, at *11 (N.D. Ohio Sept. 19, 2017); *Brown v. Timmerman-Cooper*, No. 2:10-CV-283, 2013 WL 430262, at *4 (S.D. Ohio Feb. 4, 2013); *Covington v. Davis*, No. 1:11-cv-1299, 2013 WL 1289557, at *3 (W.D. Mich. Mar. 15, 2013); *Robinson v. Mich. Dep't of Corr.*, No. 1:14-cv-165, 2014 WL 1370303, at *8 (W.D. Mich. Apr. 8, 2014); *Brittenham v. Mackintosh*, No. 09-14285, 2010 WL 148337, at *2 (E.D. Mich. Jan. 13, 2010).  Gill says that those cases involved only "usual discomforts of winter" and argues that his deprivation was more intense given the circumstances of his placement in the restraining chair.  (DN 51, at PageID # 383.)  Gill emphasizes that "[h]e was immobilized prone for two hours, . . . could not even move his hands to rub them over his mostly naked body and he was held in that state for more than two hours . . . ." (*Id.*)  While the Court questions why it is necessary for an inmate to be naked when strapped to a restraint chair that is placed directly under an active HVAC

vent,[1] given that Gill remained in the restraint chair for two hours, was attended to by a nurse, and sustained no injuries beyond immediate discomfort as a result, no reasonable jury could find that doing so exposed Gill to a health or safety risk.  *Cf. Young v. Martin*, 801 F.3d 172, 182 (3d Cir. 2015) (denying summary judgment against a plaintiff who was placed naked in restraint chair for fourteen hours with cold air blowing on him, the restraints were so tight he cried from the pain, and upon removal could no longer hold his weight and he had to be wheeled back to housing).

### b.  Count III – Gill's First Amendment Claim

In Count III of his complaint, Gill alleges that Coyne, Ferguson, and Ramos violated his right to freely exercise his religious beliefs.  (DN 1, at PageID # 10.)

The First Amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  The protections of the First Amendment extend to state inmates, and federal courts are under an obligation to make sure such rights are protected.  *See Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution.").  However, "[a]n inmate's right to freely exercise his religion may be subject to reasonable restrictions while he is incarcerated."  *Russell v. Wilkinson*, 79 F. App'x 175, 177 (6th Cir. 2003).  "Thus, the prison policy of not providing [Gill] kosher meals may be permissible if it

---

[1] Defendants offer contradicting rationales.  Owens characterized it as a safety precaution, testifying: "If you put them in the restraint chair in full clothing, then they're able to manipulate that because it gives them a little bit of extra room and they can get out of the restraint chair. So we make sure to just only put them in boxers."  (DN 46-5, at PageID # 257.)  On the other hand, Coyne suggested that it was a matter of convenience for corrections staff, testifying: "We'd go ahead and take their property, that was the decision, and then put them in the restraint chair; so that way, after removing them from the restraint chair, we wouldn't have to become hands-on with the inmate again to remove the property that he was going to lose in the first place."  (DN 46-6, at PageID # 307.)  Whatever the basis for LLCC's policy, it is hard to imagine that a restraint chair would be made less effective if inmates are permitted to wear a layer of clothing while restrained.  *See* SAFETY RESTRAINT CHAIR, INC., *SureGuard® Safety Restrain Chair Instructions* 2 https://restraintchair.com/pdfs/2020/SureGuard-Instructions_REVISED.pdf (Step 1: "Ensure that all of the detainee's personal property has been removed, to include jewelry, glasses, shoes, boots, socks, coat, hat and belt. They should only be clothed in their shirt, pants, socks or dress.")

is reasonably related to a legitimate penological interest." *Id.* Importantly, "[a] prisoner alleging that the actions of prison officials violate his religious beliefs must show that the belief or practice asserted is religious in the person's own scheme of things and is sincerely held." *See Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (internal quotation marks omitted).

*Turner* provides the governing standard for Gill's claims, and under that case, the Court must weigh Gill's First Amendment right to freely exercise his religion against the jail's legitimate penological interests. The Court considers certain factors in performing that balancing test: "First, there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." If not, the regulation is unconstitutional, and the other factors do not matter. Unlike the first factor, the remaining factors are considerations that must be balanced together: (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives" available "that fully accommodate the prisoner's rights at de minimis cost to valid penological interests." *Spies v. Voinovich*, 173 F.3d 398, 403 (6th Cir. 1999) (quoting *Turner*, 482 U.S. at 89–91).

Defendants argue that Gill's "general claims that the meals were late or inedible" should fail because Defendants Coyne, Ferguson and Ramos were not responsible for the production or transport of the meals from the nearest available kosher kitchen at [KSR] while Gill was housed at [LLCC]." (DN 46-1, at PageID # 447.) Defendants further argue that Gill's claim that Ramos improperly denied Gill his kosher meal should fail because "Ramos testified that Gill failed to inform her as the meals were being passed out that he required a kosher meal . . . Ramos provided Gill and his cellmate with two non-kosher meals . . . [and] based upon her reasonable belief that

Gill, not his cellmate, ate the second meal she filed a disciplinary report against Gill." (*Id.*) Defendants note that Gill's removal from the kosher meal program was a result of Ramos's disciplinary report which "was *not* investigated and adjudicated by Ramos." (*Id.*) In response, Gill asserts that he "had not consumed the non-kosher tray provided to his cellmate . . . but, because Defendant Ramos covered her mistake by writing up Mr. Gill, he was removed from the kosher meal program." (DN 51, at PageID # 385.) Gill argues that Ramos's proffered reasons for denying Gill his kosher tray do not constitute "a valid basis for depriving him of a meal when she had no evidence that he had eaten a meal she handed to a different inmate." (*Id.*, at PageID # 385–86.)

Gill's complaint raises three possible grounds for his First Amendment claims. First, Gill alleges that prior to his removal from the kosher meal program, "meals often arrived late or in such a bad condition that they were inedible." (DN 1, at PageID # 4.) Second, Gill alleges that Ramos improperly denied him his kosher meal on July 14, 2018. (*Id.*) Third, Gill alleges that he was improperly removed from the kosher meal program. (*Id.*, at PageID # 5.)

To the extent that Gill's claims arise from the quality and lateness of his kosher meals prior to his removal from the kosher meal program, his claims fail as a matter of law. Inmates have the right to receive "an adequate diet without violating [one's] religious dietary restrictions." *Colvin v. Caruso*, 605 F.3d 282, 290 (6th Cir.2010) (quoting *Alexander v. Carrick*, 31 Fed. App'x. 176, 179 (6th Cir.2002) (per curiam)). However, "there is no constitutional right for each prisoner to be served the specific foods he desires." *Robinson v. Jackson*, 615 F. App'x 310, 314 (6th Cir. 2015). *See Spies*, 173 F.3d at 406–07 (holding that providing a Buddhist prisoner with a vegetarian diet but not a vegan diet was constitutionally permissible, and "the fact that Plaintiffs dislike the alternate diet available does not render it unreasonable or legally deficient."). Thus, the delivery of Gill's kosher meals "hours late, ice cold, and mixed and scrambled all together" only constitute

a free exercise violation if they deprived him of an adequate diet.  "If the prisoner's diet . . . is sufficient to sustain the prisoner in good health, no constitutional right has been violated." *Alexander v. Carrick*, 31 Fed. App'x. 176, 179 (6th Cir.2002).  Here, Gill has presented no evidence that the kosher meals did not meet his dietary needs nor that the issues with his kosher meal delivery caused him to experience malnourishment.

To the extent that Gill's claims arise from the denial of a kosher tray by Ramos on July 14, 2018, his claims fail as a matter of law.  In general, an isolated incident in which an inmate is provided a meal that does not comport with his religious dietary restrictions "is not sufficient to implicate the Constitution." *Gunn v. Kentucky D.O.C.*, No. 5:07CV-P103-R, 2010 WL 2555756, at *5 (W.D. Ky. June 18, 2010) (citing *Randall v. McLeod*, No. 95–10106, 1995 WL 581973, at *4 (5th Cir. Sept.15, 1995) (per curiam) (affirming district court's dismissal of First Amendment claim based on plaintiff not getting a pork-free meal on two occasions); *White v. Glantz*, No. 92–5169, 1993 WL 53098, at *2 (10th Cir. Feb.25, 1993) (finding that an "isolated occurrence of being given two meals with green beans and bacon" did not violate a Muslim inmate's First Amendment rights)).  *See Colvin*, 605 F.3d at 291 (finding defendant was entitled to qualified immunity for inadvertently giving inmate non-kosher meal on isolated occasion); *Marr v. Case*, No. 1:07–cv–823, 2008 WL 191326, at *5 (W.D.Mich. Jan.18, 2008) ("The one time deprivation of a kosher eating utensil does not amount to a substantial burden of Plaintiff's ability to exercise his religion.").

To the extent that Gill's claims arise from his removal from the kosher meal program, the Court finds questions of fact precluding summary judgment.  In *Cousins v. Rogers*, the Eastern District of Kentucky addressed an analogous free exercise claim.  No. 3:18-CV-26-GFVT-HAI, 2019 WL 5106780 (E.D. Ky. July 15, 2019), *report and recommendation adopted*, No.

318CR00026GFVTHAI, 2019 WL 3854684 (E.D. Ky. Aug. 16, 2019).  In *Cousins*, the plaintiff alleged that defendants violated his free exercise rights in denying his request to join the kosher meal program.  *Id.* at *2.  In their motion for summary judgment, the defendants argued that they were permitted to deny the plaintiff kosher meals because he had previously identified as Catholic and because at another facility, the plaintiff had been denied a kosher meal because he had purchased non-kosher food.  *Id.* at *8.  The court found that the defendants had not presented evidence that the plaintiff was denied kosher meals because of a determination that his beliefs were not closely held.  *Id.* at *9.  The court cited to several cases in which courts in the Sixth Circuit rejected free exercise claims arising from denial of kosher meals based on the plaintiffs' purchase of non-kosher food.  *Id.* at *8–9.  Because there was nothing in the record indicating that the plaintiff had purchased non-kosher food, the court denied summary judgment, noting "nothing demonstrates whether the defendants in this case deferred or denied [the plaintiff's] requests for a kosher meal because he had failed to demonstrate to them his faith was sincerely held."  *Id.* at *9.

Here, as was the case in *Cousins*, "nothing in this record suggests [Gill] [consum]ed non-kosher food while he was housed at the jail from June to [August 2018]."  2019 WL 5106780, at *9.  The record shows that Gill was removed from the kosher meal program because of the adjudication of the disciplinary report that Ramos filed on July 23, 2018.  (DN 46-6, at PageID # 286.)  At no stage during the disciplinary proceedings was there a finding that Gill, and not his cellmate, ate the non-kosher tray.  (*See* DN 51-6, at PageID # 439–41.)  Sibrel investigated Ramos's report and documented his investigation in an investigative report.  (*Id.*, at PageID # 439.)  According to his report, Sibrel spoke to someone identified as "Lt. Melton" who told Sibrel that "Gill was being very disrespectful to Sgt. Ramos and staff on the day."  (*Id.*)  Sibrel also spoke with someone identified as "Lt. Williams," who told Sibrel: "I spoke with Sgt. Ramos and [Gill's

cellmate]. [Gill's Cellmate] took in both trays and never handed one back out, or stated that [] Gill was Kosher.  However Instead took both trays into cell. when picked up both trays were eaten and [] Gill said he was Kosher." (*Id.*)  Sibrel also spoke with Ramos, who told him that "the statement that Lt. Williams made was accurate and true." (*Id.*)  Sibrel wrote that he spoke with Gill who told him, "I Didn't take two trays and did not get my kosher tray that day." (*Id.*)  Nothing in the report supports a finding that Gill ate a nonkosher meal in contravention of his stated religious tenets.

The Court notes that Gill does not challenge KDOC's policy of removing inmates from the kosher meal program for noncompliance.  (*See* DN 51, at PageID # 384.)  Indeed, "[t]he prison must have some standards to determine the sincerity of a religious belief before granting an accommodation request." *Blumenthal v. Armstrong*, No. 2:08-CV-273, 2010 WL 1265905, at *5 (W.D. Mich. Feb. 10, 2010), *report and recommendation adopted*, No. 2:08-CV-273, 2010 WL 1265964 (W.D. Mich. Mar. 29, 2010).  However, "[t]he prison must use some objective factors to justify the decision to deny a Kosher meal request." *Id.  See Colvin*, 605 F.3d at 296 (noting that "policy of removing a prisoner from the kosher-meal program for mere possession of a nonkosher food item may be overly restrictive of inmates' religious rights").  Viewing the facts in Gill's favor, Defendants have not met their burden of showing that Gill was removed from the kosher meal program because he consumed a non-kosher meal in violation of the program policy and contravening his stated religious beliefs.  In other words, "[u]nder the circumstances of this case," the Court is unable to determine as a matter of law whether the "defendants correctly considered plaintiff's sincerity and made an appropriate and well reasoned decision under the totality of facts available." *Blumenthal*, 2010 WL 1265905, at *5.

The Court now turns to the question of the individual Defendants' liability.[2]  Beginning with Ramos, Defendants assert that Gill's removal from the kosher meal program resulted from a guilty finding on her disciplinary report, which "was *not* investigated and adjudicated by Ramos." (DN 46-1, at PageID # 447.)  Gill's theory of liability against Ramos is that she improperly withheld the kosher meal because "she believed (without evidence that Mr. Gill has eaten non-kosher meals in the past . . . [and] covered her mistake by writing up Mr. Gill."  (DN 51, at PageID # 385.)  Defendants argue that Ramos's report was "based upon her reasonable belief that Gill, not his cellmate, ate the second meal . . . ."  (DN 46-1, at PageID # 447.)

Under section 1983, "[l]iability cannot be established absent a clear showing that the defendants were personally involved in the activity forming the basis of the alleged unconstitutional behavior."  *Mullins v. Hainesworth*, No. 95-3186, 66 F.3d 326, 1995 WL 559381, at *1 (6th Cir. Sept. 20, 1995).  While Ramos might not have made the final decision to remove Gill from the program, she was personally involved in the process; she was responsible for delivering Gill his kosher meal, denied Gill's request for his kosher meal, wrote a disciplinary report related to the incident, and provided statements to Sibrel during his investigation of her report.  Ramos's disciplinary report stated affirmatively that Gill "had [] eaten a regular tray."  (DN 51-6, at PageID # 439.)  However, during her deposition, Ramos admitted that she did not know that Gill had eaten the nonkosher meal.  (DN 46-8, at PageID # 337.)  Ramos testified that the basis for her belief that Gill had eaten the nonkosher meal was that "he had received multiple disciplinary reports for eating food that wasn't kosher in the kosher program in the past."  (*Id.*)  In reporting Gill for violating the kosher meal program and continuing to represent that Gill violated the program during Sibrel's investigation, Ramos was aware that as a result, Gill "could be taken

_____

[2] The Court does not address whether any of the Defendants are entitled to qualified immunity because the issue was not raised in the Parties' briefs.

off the kosher list." (DN 46-8, at PageID # 347.) Notably, Ramos did not submit her disciplinary report until July 23, 2018, nine days after the incident and six days after Gill submitted his grievance concerning the denial of his kosher meal. (DN 51-6, at PageID # 436, 439.) During her deposition, Ramos could not say why she submitted the report late and backdated. (*See* DN 46-8, at PageID # 344.) Ramos was aware that merely reporting Gill for violating the kosher meal program would make his prior grievance against Ramos "nongrievable." (*Id.*, at PageID # 343.) Viewing these facts most favorably to Gill, a reasonable jury could find that Ramos's individual actions contributed to Gill's constitutional deprivation.

On the other hand, Gill has not presented sufficient evidence to create a question of fact as to Coyne's and Ferguson's liability. An official must personally act to deprive an individual of a constitutional right. In other words, *respondeat superior* does not apply in the context of § 1983 claims. *See Colvin*, 605 F.3d at 292 ("Allegations of *respondeat superior* do not sustain a § 1983 claim against [public] employees in their individual capacities, meaning that officials are personally liable for damages under that statute only for their own unconstitutional behavior." (internal quotation marks omitted)). Here, there is no evidence in the record that demonstrate that Coyne or Ferguson were personally involved with Gill's removal from the kosher meal program. Therefore, Gill's claims against these Defendants fail as a matter of law.

### c. Count IV – Gill's RLUIPA Claim

In Count IV of his complaint, Gill alleges that Coyne Ferguson, and Ramos violated his right to practice his faith in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). (DN 1, at PageID # 10.) Specifically, Gill alleges that these "Defendants' removal of Mr. Gill from the kosher meal program made it impossible for him to practice his faith." (*Id.*)

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution." 42 U.S.C. § 2000cc-1(a).  The statute provides a private right of action to individuals who allege that they were subjected to a violation. 42 U.S.C. § 2000cc-2(a).  Analysis under RLUIPA is a "three-act play."  *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019).  First, "the inmate must demonstrate that he seeks to exercise religion out of a 'sincerely held religious belief.'"  *Id.* (quoting *Holt v. Hobbs*, 574 U.S. 352, 361, 135 S. Ct. 853, 862, 190 L. Ed. 2d 747 (2015)).  Second, the inmate "must show that the government substantially burdened that religious exercise."  *Id.*  Upon satisfaction of these two steps, the burden then shifts to the government for the third act: it "must meet the daunting compelling-interest and least-restrictive-means test."  *Id.*

The Parties do not address the three-step test in their briefs.  Defendants' argument for summary judgment on Gill's RLUIPA claim is based on lack of personal involvement in the alleged deprivation.  (DN 46-1, at PageID # 448.)  In his response, Gill notes that Defendants did not address the merits of his RLUIPA claim, and proffers that the bases for his First Amendment claim also support his RLUIPA claim.  (DN 51, at PageID # 386–87 n.10.)  Accordingly, the Court looks to the evidence supporting Gill's First Amendment claim and other evidence in the record in applying the three-step test.

First, the Court finds sufficient evidence to at least create a question of fact as to whether Gill's beliefs are sincerely held.  During his deposition, Gill testified that he has been practicing Judaism for ten years, that he has observed a kosher diet throughout that period when permitted by KDOC, and that he never intentionally violated the kosher meal program.  (DN 46-2, at PageID # 187, 193, 208.)  There is also independent evidence in the record that Gill never missed a kosher meal at LLCC prior to the July 14, 2018 incident and that he rejoined the kosher meal program

following his removal when he became eligible in November 2019.  (DN 46-6, at PageID # 285, 290.)  When asked whether he wanted to remain faithful to his religion, Gill testified that he did, and when asked whether he changed his religion to receive special treatment, Gill testified that he didn't.  (DN 46-2, at PageID # 208.)  Based on these facts, the Court find that Gill has met his burden under Step 1.

Second, the Court finds sufficient evidence that his removal from the kosher meal program substantially burdened his ability to exercise his religious belief.  Gill's removal from the kosher meal program prevented him from keeping kosher for over a year between July 2018 and November 2019.  "The greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)."  *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014).  Therefore, Gill has met his burden under Step 2.

Third, the Court finds that Defendants have not shown a compelling interest in removing Gill from the program that could not have been met by a less restrictive means.  Indeed, Defendants did not even address the issue.  (*See* DN 46-2, at PageID # 448–49.)  Therefore, Defendants have not met their burden under Step 3.

Defendants argue that Coyne and Ferguson are entitled to summary judgment because "Plaintiff pleaded no factual allegations against either of them in regard to Plaintiff's kosher meals."  (DN 46-1, at PageID # 448.)  Defendants further argue Gill has failed to establish an RLUIPA violation because neither Coyne, Ferguson, nor Ramos "were responsible for investigating or adjudicating the disciplinary report alleging that he violated the kosher meal program conditions, neither did they personally remove Gill from the program."  (*Id.*)  For the reasons discussed in Part III(b) *supra*, the Court finds sufficient evidence of personal involvement

in Gill's removal from the kosher meal program by Ramos to establish liability for an RLUIPA, but insufficient evidence with respect to Coyne and Ferguson.

### d. Forms of Relief

Given that all official capacity claims will be dismissed, the Court need not address all of the Parties' arguments concerning the proper relief for Gill's claims.  Still at issue are Gill's claim for injunctive relief against Ramos and Gill's claim for monetary damages against Ramos RLUIPA.

### i. Injunctive Relief

Defendants argue that, "to the extent Plaintiff's claims can be construed as seeking injunctive relief under RLUIPA, such claims are moot due to Plaintiff's transfer from [LLCC]." (DN 46-1, at PageID # 449.)  Defendants do not explicitly raise this mootness argument with respect to Gill's section 1983 claims, but they do cite to a Sixth Circuit case in support of the proposition that "a prisoner's § 1983 claims for injunctive relief became moot after he was transferred to another facility."  (*Id.*)  In response to Defendants' argument that Gill's RLUIPA claims for injunctive relief against Coyne and Ferguson in their official capacities are moot, Gill argues that his transfer out of LLCC does not render his claims moot because the alleged violations still "could be repeated."  (DN 51, at PageID # 386.)

Based on the Court's discussion above, the only claims that survive are those against Ramos in her individual capacity.  With respect to those claims, Gill's claim for injunctive relief is moot because Ramos is no longer employed by KDOC.  (*See* DN 46-8, at PageID # 332–33.)

### ii. RLUIPA Claims for Monetary Damages

Defendants argue that Gill's RLUIPA claims against Coyne, Ferguson, and Ramos in their individual capacities fail as a matter of law because "RLUIPA does not permit claims for damages against defendants in their individual capacities." (DN 46-1, at PageID # 448-49.)

A plaintiff who brings a successful claim under RLUIPA may "obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a). The Supreme Court has determined that RLUIPA's relief provision does not constitute a waiver of Eleventh Amendment immunity. *Sossamon v. Texas*, 563 U.S. 277, 285–86, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011); *see also Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009). Following *Sossamon*, the Sixth Circuit concluded that RLUIPA also does not authorize money damages claims against officials in their individual capacities. *Haight v. Thompson*, 763 F.3d 554, 568–69 (6th Cir. 2014). The Supreme Court, however, recently clarified the logic underlying the *Sossamon* decision. *Tanzin v. Tanvir*, –— U.S. ——, 141 S. Ct. 486, 492–93, 208 L.Ed.2d 295 (2020). While addressing a claim under the Religious Freedom Restoration Act ("RFRA"), which contains an identical "appropriate relief" clause, the Court concluded that RFRA allows money-damages suits against officials in their individual capacities. *Id.* at 492. The Court explicitly stated that this decision was not in conflict with *Sossamon* because that case concerned entities protected by the Eleventh Amendment, and the Eleventh Amendment does not bar individual capacity suits. *Id.* at 492–93.

Courts are divided on the question of how *Tanzin* affects claims for monetary damages under RLUIPA. For example, in the Western District of Wisconsin noted that in the *Tanzin* decision, "the Court did not discuss whether its holding also applied to RLUIPA, and no other court has discussed the issue." *Johnson v. Goff*, No. 19-CV-543-BBC, 2021 WL 39639, at *7 (W.D. Wis. Jan. 5, 2021). In *Johnson*, the court avoided addressing the issue in first instance, and

instead found that plaintiff failed on the merits to establish individual capacity liability against defendants. *Id.* Subsequently, the same court reiterated that whether *Tanzin* holding authorizes monetary damages for individual capacity claims "remains an open question." *Greene v. Teslik*, No. 18-CV-116-WMC, 2021 WL 1820788, at *6 (W.D. Wis. May 6, 2021). The Northern District of Indiana has declined to dismiss an RLUIPA claim pursuant to 28 U.S.C. § 1915A and found that, post-*Tanzin*, a plaintiff "has a nonfrivolous argument that a claim for [monetary] damages [against a county] survives." *Williams v. Redman*, No. 3:20-CV-196-JD-MGG, 2021 WL 1907224, at *3 (N.D. Ind. May 12, 2021). In contrast, the Western District of New York recently rejected an argument that *Tanzin* broadly authorizes money damages under RLUIPA in *any* situation where sovereign immunity does not apply. *Tripathy v. Schneider*, No. 21-CV-6339 FPG, 2021 WL 4204985, at *2 (W.D.N.Y. Sept. 16, 2021). Rather, the court's reading of *Tanzin* was narrower, finding that "the distinction drawn by *Tanzin* is between claims against federal employees, against whom claims for money damages are permitted, and state employees, against whom such claims are not permitted." *Id.*

Within the Sixth Circuit, courts have diverged in their application of *Tanzin*. This Court has found that *Tanzin* abrogated the Sixth Circuit's holding in *Haight* that RLUIPA also does not authorize money damages claims against officials in their individual capacities. *Ruplinger v. Louisville/Jefferson Cty. Metro Gov't*, No. 3:19-CV-583-DJH-RSE, 2021 WL 682075, at *4 (W.D. Ky. Feb. 22, 2021). In *Ruplinger*, this Court denied a county's Rule 12(b) motion to dismiss claims for monetary and punitive damages under RLUIPA, reasoning that:

> [i]n the absence of guidance from the Sixth Circuit about how *Tanzin* affects the holding in *Haight*, the Court will follow the analysis set out in *Tanzin*. Since Louisville Metro Government is not protected by Eleventh Amendment immunity, *see Boler*, 865 F.3d at 410, the *Sossamon* decision does not bar Ruplinger's money-damages claim or punitive-damages claim under RLUIPA.

*Id.*  In contrast, in several post-*Tanzin* cases, courts have continued to cite to *Haight* as barring monetary damages for individual capacity claims under RLUIPA without addressing the impact of *Tanzin*.  *Salami v. Gateway Found., Inc.*, No. 2:19-CV-11683, 2021 WL 1277963, at *7 (E.D. Mich. Feb. 18, 2021), *report and recommendation adopted*, No. 19-CV-11683, 2021 WL 1267581 (E.D. Mich. Apr. 6, 2021); *Montgomery v. Gentry*, No. 3:20-CV-00406, 2021 WL 4074792, at *7 (M.D. Tenn. Aug. 17, 2021), *report and recommendation adopted Montgomery v. Gentry*, No. 3:20-CV-00406, 2021 WL 4060462 (M.D. Tenn. Sept. 7, 2021); *El Bey v. Kehr*, No. 1:19-CV-693, 2021 WL 4033137, at *6 (S.D. Ohio Sept. 3, 2021).

The Western District of Michigan was the first court in this circuit to expressly find that *Tanzin* did not impact the Sixth Circuit's holding in *Haight*.  *Mease v. Washington*, No. 2:20-CV-176, 2021 WL 1921071, at *13 (W.D. Mich. May 13, 2021).  In *Mease*, a district court in the Western District of Michigan held that because *Tanzin* did not expressly overrule *Haight*, and because the reasoning applied in *Tanzin* was different than that in *Haight*, the plaintiff was not entitled to bring a claim for money damages against officers in their individual capacities under the RLUIPA. The court reasoned:

> Regardless of whether *Haight*'s analysis is more persuasive than the analysis of the other courts, *Haight*'s determination that RLUIPA does not authorize damages against state officials in their individual capacity was not expressly overruled by *Tanzin*. Moreover, the basis of the *Haight* court's decision—the need for clarity in statutes promulgated under the Spending and Commerce Clauses—did not apply in *Tanzin*. As a consequence, *Tanzin* did not abrogate *Haight*, which remains controlling authority in this circuit. Plaintiff therefore is not entitled to damages against Defendants in their individual capacities for the alleged violations of RLUIPA.

*Id.* at *16.  Subsequently, the Eastern District of Michigan has twice declined to follow this Court's reasoning in *Ruplinger* and adopted the holding in *Mease*.  *Chaaban v. City of Detroit*, No. 20-

CV-12709, 2021 WL 4060986, at *5 (E.D. Mich. Sept. 7, 2021); *Catlett v. Washington*, No. 20-13283, 2021 WL 3680196, at *6 (E.D. Mich. Aug. 19, 2021).

Absent thorough briefing by the Parties, the Court declines to decide whether the Supreme Court's ruling in *Tanzin* operates to permit monetary damages against defendants sued in their individual capacity under RLUIPA.  Based on the arguments presented in their motion, Defendants have failed to establish that Gill's claim for monetary damages under RLUIPA is precluded as a matter of law.

## IV.    ORDER

For the foregoing reasons,

IT IS HEREBY ORDERED as follows:

1. Defendants' motion for summary judgment is **GRANTED in part DENIED in part**.

2. Counts I, II, and V of Gill's complaint are **DISMISSED with prejudice**.

3. Gill's claims against Coyne and Ferguson under Counts III and IV of his complaint are **DISMISSED with prejudice**.

4. Defendants' motion for summary judgment is **DENIED** with respect to the claims alleged against Ramos in Counts III and IV.

5. Gill's claims for injunctive relief against Ramos are **DISMISSED with prejudice**.

Colin H Lindsay, Magistrate Judge
United States District Court

October 13, 2021

cc:  Counsel of record